The STATE of Texas

v.

Nancy N. NEESLEY, Appellee.

No. PD–1396–06.

Court of Criminal Appeals of Texas.

Nov. 7, 2007.

James R. Butler, Houston, for Appellant.

Eric Kugler, Asst. D.A., Houston, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

This case addresses the questions of how the term "specimen" should be interpreted in the context of § 724.012(b) of the Texas Transportation Code and how many specimens the statute permits to be taken. We hold that specimen should be construed to mean a usable sample, and that one and only one specimen (as so defined) may be taken. Accordingly, we reverse the judgment of the court of appeals, and remand to the trial court for further proceedings consistent with this opinion.

### THE FACTS AND PROCEDURAL POSTURE

On July 26, 2004, the appellee was involved in a head-on automobile collision with Cynthia Perez. Deputy Leo Anders, an accident investigator with the Harris County Sheriff's Department, testified that he spoke with a witness who claimed that the appellee veered into Perez's lane. The witness told Anders that he was traveling northbound on Boudreaux Road directly in front of Perez's vehicle when the appellee, who was traveling southbound, veered into the northbound lane. The witness said that, after he swerved to the right to avoid a collision with the appellee, the appellee continued driving partially in the northbound lane and that as the witness watched her in his rearview mirror, he saw her collide with Perez.

When Anders spoke to the appellee, he detected a "moderate" odor of alcohol. Thinking that alcohol may have contributed to the accident, Anders sought to verify the witness's claim that the appellee veered into oncoming traffic. Meanwhile, the appellee was transported to Hermann Hospital for treatment of her injuries resulting from the accident. After investigating the scene of the accident, Anders determined that the collision occurred one foot inside of Perez's lane. At that point, Anders asked the chief paramedic about Perez's medical condition. The paramedic replied that Perez was critically injured and still trapped behind the steering wheel of her vehicle. Rescue workers attempted to free Perez from the wreckage, but during the rescue attempt she went into cardiac arrest and died at the scene. Anders contacted Deputies Marines and Hernandez, told them that the appellee's blood would have to be analyzed at the hospital in order to determine whether the appellee was intoxicated, and assigned them to handle the blood sampling.

At the hospital, Deputy Hernandez spoke with the appellee and also detected an odor of alcohol. He then performed a field sobriety test, on the basis of which both he and Deputy Marines concluded

that the appellee was probably intoxicated. Marines read the appellee the statutory warning form regarding breath and blood sampling, but the appellee refused to provide a sample.[1] Marines filled out the mandatory blood draw form, and at 8:35 p.m., a registered nurse drew a blood sample from the appellee's left arm.[2] However, at the time that the blood was drawn, the appellee had an intravenous line of saline solution attached to her left wrist. This resulted in the contamination of the blood sample, and at 9:35 p.m., Marines had the nurse draw a second sample of blood. The appellee filed a motion to suppress this second sample and the trial court granted that motion. The State appealed from that judgment.[3]

Subsection (b) of § 724.012 of the Texas Transportation Code requires that a peace officer take a blood or breath specimen in cases where a person was killed or has suffered serious bodily injury as a result of a car accident.[4] On appeal to the First Court of Appeals, the State argued, *inter alia,* that (1) the statute should be construed to mean at least one "usable" breath or blood specimen; and (2) drawing additional blood from the appellee was merely an extension of the initial blood draw, and no additional authorization was required for the additional draw. In response to argument (1), the court of appeals determined that "a specimen," as used in section 724.012(b), means a single specimen, regardless of whether or not the

specimen is usable; and in response to argument (2), the court determined that the second blood draw was not a continuation of the initial blood draw because the grounds justifying each drawing of blood were different. Consequently, the court of appeals affirmed the judgment of the trial court, holding that the evidence was properly excluded.[5] We granted the State's petition for discretionary review to address whether the court of appeals properly construed § 724.012(b), as this issue presents an important question of state law that is likely to recur in future cases of this sort.[6]

## ANALYSIS

### Statutory Construction

Section 724.012 of the Texas Transportation Code provides the following:

### § 724.012. Taking of Specimen

(a) One or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person:

> (1) while intoxicated was operating a motor vehicle in a public place, or a watercraft; or

> (2) was in violation of Section 106.041, Alcoholic Beverage Code.

(b) A peace officer shall require the taking of a specimen of the person's breath or blood if:

---

1. Form DIC–24, contained within the clerk's record, is the written component of the statutory warning required in cases where a peace officer requests a voluntary blood or breath specimen from a person. *See* TEX. TRANSP. CODE ANN. § 724.015.

2. Form THP–51, also contained within the clerk's record, is the form that allows a peace officer to require that a hospital perform a mandatory blood drawing. *See* TEX. TRANSP. CODE ANN. § 724.012(b).

3. The State is entitled to appeal an order of a court in a criminal case if the order grants a motion to suppress evidence. *See* TEX.CODE CRIM. PROC. ANN. art. 44.01(a)(5).

4. TEX. TRANSP. CODE ANN. § 724.012(b).

5. *State v. Neesley,* 196 S.W.3d 356, 365 (Tex.App.Houston [1st Dist.] 2006).

6. TEX.R.APP. P. 66.3(b).

(1) the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;

(3) at the time of the arrest the officer reasonably believes that as a direct result of the accident:

(A) any individual has died or will die; or

(B) an individual other than the person has suffered serious bodily injury; and

(4) the person refuses the officer's request to submit to the taking of a specimen voluntarily.

(c) The peace officer shall designate the type of specimen to be taken.

(d) In this section, "serious bodily injury" has the meaning assigned by Section 1.07, Penal Code.[7]

■ In its first ground for review, the State argues that the court of appeals erred in holding that the statute's requirement that officers take "a specimen" was actually a limitation prohibiting officers from taking more than one specimen even where the first specimen was not usable. Our role in interpreting the wording of § 724.012(b) is limited by the holding in *Boykin v. State*,[8] which maintains:

If the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then and only then, out of absolute

necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such extratextual factors as executive or administrative interpretations of the statute or legislative history.[9]

Thus, the first step of our analysis is to determine whether the plain language of § 724.012 is either ambiguous or it leads to absurd results.

In the context of statutory construction, "ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses."[10] In contrast, a statute is unambiguous where it "admits of no more than one meaning."[11] The segment of § 724.012(b) that we are called upon to interpret reads that "a peace officer *shall require* the taking of *a specimen* of the person's breath or blood."[12] The one thing that this segment of the statute clearly and unambiguously provides is that, under certain prescribed circumstances, a peace officer *must take at least one specimen* of the person's breath or blood. But it is unclear from the face of § 724.012(b), at least read in isolation, how many specimens it *permits* to be taken.

### How Many Specimens Are Permitted?

■ With respect to the question of how many specimens are *permitted*, the § 724.012(b), by itself, could be interpreted to mean:

♦ **Interpretation A:** The taking of one and only one specimen is permitted.

---

7. Tex. Transp. Code Ann. § 724.012.

8. *Boykin v. State,* 818 S.W.2d 782 (Tex.Crim. App.1991).

9. *Id.* at 785–86.

10. 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.02, at 6 (5th ed.1992).

11. *Id.*

12. Tex. Transp. Code Ann. § 724.012 (emphasis added).

♦ **Interpretation B:** The taking of an unlimited number of specimens is permitted (though constitutional concerns, such as due process, might independently impose an upper limit).

♦ **Interpretation C:** The taking of as many specimens as are needed to acquire a usable sample is permitted (again, within constitutional bounds).

It might appear, then, that the statute is ambiguous with respect to this question, read in isolation. However, reading § 724.012(b) *in pari materia* with the balance of Chapter 724, Subchapter B ("Taking and Analysis of Specimen") of the Transportation Code, the seeming ambiguity is resolved.

Section 724.012(a) of the Transportation Code permits a peace officer to take "one or more specimens" whenever he has reasonable grounds to believe a DWI offense has occurred. And the DWI suspect "is deemed to have consented" to the taking of "one or more specimens" under Section 724.011 of the Transportation Code, the so-called "implied consent" statute. These provisions alone, however, cannot answer the question how many "specimens" a peace officer is permitted to take under subsection (b) of Section 724.012, the provision that *requires* that at least one specimen be taken under certain enumerated circumstances. The reason for this is the operation of Section 724.013 of the Transportation Code.[13] Section 724.013 does not permit the taking of *any* specimens, except under the circumstances enumerated in 724.012(b), if the suspect refuses to submit.

Therefore, while Section 724.012(b) actually *requires* the taking of one specimen under the circumstances there enumerated, reading that provision in combination with Sections 724.011, 724.012(a), and, most importantly, 724.013, the statutory scheme as a whole clearly *permits* no more than the one specimen that is required when the suspect refuses to submit.

Accordingly, we hold that, even under the circumstances enumerated in § 724.012(b), if the suspect refuses to submit to the taking of a specimen, the peace officer shall be limited to taking only the one specimen that the subsection requires. But this does not wholly resolve the issue before us.

### What Does "Specimen" Mean?

■ Nowhere in the statute is the word "specimen" defined.[14] Reasonably well-informed persons could interpret it in more than one sense. For example:

♦ **Interpretation 1:** A specimen refers to any sample taken, regardless of its content (e.g., A sample that is 99.99% saline and 0.01% blood is a specimen of blood).

♦ **Interpretation 2:** A specimen refers to a pure sample. (e.g., Only a sample that is 100% blood is a specimen of blood).

♦ **Interpretation 3:** A specimen refers to a sample containing a substantial, but not necessarily usable, percentage of a particular material (e.g., A sample that is 0.01% less pure than usable is a specimen).

13. TEX. TRANSP. CODE § 724.013 ("Except as provided by Section 724.012(b), a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer.")

14. While there are two sections within Chapter 724 of the Texas Transportation Code— § 724.016, titled "Breath Specimen," and § 724.017, titled "Blood Specimen"—neither of these sections defines the term "specimen." Rather, these two sections address the procedural requirements of taking breath and blood specimens.

♦ **Interpretation 4:** A specimen refers to a sample that is usable.

Since reasonably well informed persons could interpret the word "specimen" in any of these different senses, we hold that the statute is ambiguous. Consequently, we are permitted, in accordance with *Boykin*, to look to extratextual factors in order to arrive at a sensible interpretation. Thus, the second step of our analysis is to determine which of the above interpretations is best supported by extratextual factors.

In relevant part, the Code Construction Acts provides that, in construing a statute, whether or not the statute is ambiguous on its face, a court may consider among other matters, the:

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

* * *

(5) consequences of a particular construction.[15]

In our analysis of how to interpret the term specimen as it is used in § 724.012, these considerations weigh in favor of Interpretation 4, that specimen should be construed to mean a usable sample.[16]

Subsection (b) of § 724.012 can be traced back to Senate Bill 1 of the 68th Legislature.[17] The object sought to be attained by this bill was to "save lives and decrease the number of casualties caused by drunken drivers."[18] When signed into law in 1984, subsection (b) originally required that a specimen be taken only in cases where a person had died or would die as a result of the accident. In 2003, subsection (b) was amended to also require the taking of a specimen in cases where a person suffered serious bodily injury as the result of the accident.[19] The discussion surrounding this amendment focused on the fact that "Texas [had] the nation's worst problem with drunk driving in terms of total deaths and injuries, with 50% of traffic fatalities involving alcohol." [20]

Each of the extratextual factors cited weigh in favor of interpreting "specimen" to mean a usable sample. In order to decrease the number of casualties caused by drunk drivers, it is necessary to first determine whether a driver is intoxicated. An unusable sample provides no useful information to assist in making this determination. It is implausible that the Legislature would have enacted a statute that requires a procedure as invasive as drawing a blood sample unless that procedure was intended to result in a usable sample. Thus, both Interpretations 1 and 3, above, run contrary to legislative intent. Interpretation 2, on the other hand, applies too strict of a standard which, aside from being practically unfeasible, also provides no information in addition to that which could be acquired by testing any usable sample. Therefore, we find that the most sensible interpretation of the term "specimen" is Interpretation 4, that is, to construe "specimen" to mean a usable sample.

---

15. Tex. Gov't Code Ann. § 311.023.

16. Subsections (4), (6) and (7) of § 311.023 are not discussed because they do not provide any relevant information with respect to the issue at bar.

17. Act of January 1, 1984, 68th Leg., R.S., ch. 303, 1983 Tex. Gen. Laws 1568, 1584 (amended 1993, 1995, 1997, 2003).

18. House Comm. On Criminal Jurisprudence, Bill Analysis, Tex. S.B. 1, 68th Leg., R.S. (1983).

19. Act of September 1, 2003, 78th Leg., R.S., ch. 422, 2003 Tex. Gen. Laws 1669.

20. House Comm. On Law Enforcement, Bill Analysis, Tex. H.B. 292, 78th Leg., R.S. (2003).

## CONCLUSION

We hold that in cases which satisfy the conditions for mandatory taking of a specimen under § 724.012(b), a peace officer is required to take one specimen of breath or blood and is permitted to take no more than one specimen. In these cases, "specimen" is to be construed to mean a usable sample. The judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

KELLER, P.J., filed a concurring opinion in which HERVEY, J., joined.

JOHNSON, J., filed a dissenting opinion.

KELLER, P.J., filed a concurring opinion in which HERVEY, J., joined.

Transportation Code § 724.012(a) plainly confers on a peace officer the general authority to obtain "[o]ne *or more* specimens of a person's breath or blood" if the person is arrested and the officer has "reasonable grounds to believe" the person was driving while intoxicated.[1] No statute is needed to confer authority to obtain a specimen of breath or blood from someone who freely and expressly consents to every single draw. The point of Chapter 724 is to imply consent in certain situations in which express consent is absent, thus § 724.011's language that a person "is *deemed* to have consented" subject to the provisions of this chapter.[2] So, a reading of the chapter indicates that it confers upon peace officers the authority to obtain "one or more" specimens under at least

some circumstances in which express consent is absent.

Express consent can be absent under two possible circumstances: (1) the person refuses consent, (2) the person is incapable of giving or refusing consent. The Legislature has set forth rules governing implied consent in both circumstances. First, the Legislature has decreed that "a specimen" may *not* be taken if the person refuses consent "[e]xcept as provided by Section 724.012(b)."[3] Second, the Legislature has decreed that a person who is "dead, unconscious, or otherwise incapable of refusal" has not "withdrawn" his implied consent,[4] and thus, "a specimen" may be taken by certain authorized entities.[5] § 724.012(b) describes the circumstances under which a peace officer is *required* to obtain a breath or blood draw: the peace officer "shall require" the taking of "a specimen" under certain circumstances in which death or serious bodily injury has occurred.[6]

*All* of the provisions that specifically prescribe the application of implied consent under the various circumstances in which implied consent would be needed refer to the taking of "a specimen." If the "a" before "specimen" meant "one and only one," then the general authority conferred by § 724.012(a) to take "one or more" specimens would be meaningless. Clearly, "a specimen" is not intended as a reference to the number of specimens that can be taken but is simply a reference to the type of evidence that can or must be obtained ("a specimen").

Consequently, reading § 724.012(a)'s authorization to obtain "one or more spe-

---

1. TEX. TRANSP. CODE § 724.012(a)(emphasis added).

2. § 724.011(a)(emphasis added).

3. § 724.013.

4. § 724.014(a).

5. § 724.014(b), (c).

6. *See* § 724.012(b).

cimens" together with § 724.012(b)'s instruction that a peace officer "shall require" the taking of "a specimen" leads to the conclusion that obtaining one specimen or multiple specimens both satisfy § 724.012(b)'s mandate that "a specimen" be obtained. Because a peace officer can choose to take multiple specimens to satisfy § 724.012(b)'s requirement that a specimen be obtained, the exception to the prohibition against taking "a specimen" when the person refuses to consent— "[e]xcept as provided by Section 724.012(b)"—allows for the taking of multiple specimens.[7] In enacting the exception, the Legislature has simply decreed that implied consent cannot be withdrawn by a suspect when the circumstances requiring a breath or blood draw are present.

I concur only in the Court's judgment.[8]

JOHNSON, J., filed a dissenting opinion.

The state has challenged the decision of the court of appeals to affirm the trial court's suppression of the results of two blood tests. The trial court held an extended hearing and received evidence from six witnesses. It then suppressed the blood-test results, the first pursuant to Rules of Evidence 104, 702, and 705, and the second pursuant to Transportation Code § 724.012(b). The court of appeals affirmed. The state now appeals to this Court, asking that we interpret the term "a specimen" as written in § 724.012(b) to mean "a usable specimen."

### Deputy Anders

Appellee was involved in a head-on automobile collision. The time of the collision is unclear. The state's first witness, Leo Anders, a Harris County Deputy Sheriff and accident investigator, testified that he was dispatched to the scene at about 5:00 p.m.[1] Two cars were involved, with one driver, Ms. Perez, pinned inside her car. The other driver, appellee, was lying a ditch by the side of the road. Before Anders could talk to appellee, another driver, Sergio Parroquin "confronted" Anders. Parroquin told Anders that he had been driving ahead of Perez; appellee veered into his lane, he swerved to avoid her, and appellee then continued to drive partially in the oncoming lane and hit Perez. Parroquin saw the collision in his rearview mirror.

Anders spoke with appellee long enough to establish her identity. Even though she was wearing an oxygen mask at the time, he noticed a moderate odor of alcohol on her breath. Anders was unable to form an opinion at the scene as to appellee's level of intoxication because her injuries prevented him from administering sobriety tests. Appellee was taken to Memorial

---

**7.** The Court's argument would be better supported if the statutory exception said, "except as *required* by Section 724.012(b)," although even then I think my interpretation would still be valid, but the statute says "except as *provided* by Section 724.012(b)," so one need not necessarily conclude that the exception encompasses only the bare minimum necessary to meet the mandatory draw requirement.

**8.** The Court's determination that only *one* specimen may be taken is mitigated by its further determination that "specimen" necessarily means a "usable" specimen. The State

prevails in this case because only one "usable" specimen (the second) was obtained. But in a given case, the State may find it useful to obtain multiple (usable) specimens for the purpose of conducting a retrograde extrapolation analysis. *See Mata v. State,* 46 S.W.3d 902 (Tex.Crim.App.2001). So the disagreement over the statutory language is not a trivial matter but can seriously impact a DWI prosecution.

**1.** Other deputies reported being sent to the scene at about 7:00 p.m.

Hermann Hospital. At this time, Perez had been pinned in the wreckage for more than 40 minutes and was in critical condition. She died at the scene.

Anders contacted Deputies Arturo Marines and Lawrence Hernandez, two other accident investigators, and asked them to go to the hospital and get a blood sample from appellee. He contacted them a second time to inform them that Perez had died.

Anders also talked with Ashley Carranza, who was driving 300 yards behind Perez at the time of the collision. Carranza told Anders that Perez had been driving erratically and crossed the center line a few times, apparently in an effort to pass vehicles that were ahead of her. Physical evidence at the scene indicated that Perez was in her own lane at the time of impact. Another deputy took Carranza's written statement.

### Deputy Marines

Deputy Marines testified that, at 7:13 p.m., he was on his way to the scene when Anders called him and asked him to go to the hospital to get a blood sample, voluntarily if possible. The request was changed to a mandatory draw after Perez died. Marines found appellee in Trauma Room 3, lying on a gurney and attended by two nurses, Nancy Lopez and Penny Pope. He detected a strong odor of alcohol on appellee's breath. Marines read appellee the statutory warning, form DIC–24, which begins "[y]ou are under arrest for ... operating a motor vehicle ... in a public place while intoxicated ...," and requested a voluntary blood sample. Appellee refused. She did not sign the refus-

al because both arms had been broken in the collision.[2]

Marines then filled out form THP–51, Statutory Authorization for Mandatory Blood Specimen. He was present when the nurses drew the first specimen at 8:35 p.m., 2 vials for the sheriff's office and other vials for the hospital laboratory. He did not administer sobriety tests because appellee was being treated and had two broken arms. She did, however, answer his questions appropriately.

At about 9:15 p.m., one of the nurses told Marines that the first specimen had been rejected by the hospital laboratory as "contaminated." Marines did not repeat his request for a voluntary sample or file out a second THP–51, but instructed the nurses to do another draw. The second draw was done at 9:25 p.m., 50 minutes after the first and at least two and a half hours after the collision. The same nurses took the second specimen.

### Deputy Hernandez

Deputy Hernandez testified that he was dispatched to the scene of a fatality collision, i.e., after Perez died. Anders asked him to go to the hospital and assist Marines with getting a blood sample. He talked briefly with appellee, who was lying on a gurney with an IV in her arm. He detected "an odor" of alcohol on appellee's breath. While appellee was lying on the gurney, he performed a horizontal gaze nystagmus test (HGN) and "found all six clues and vertical gaze nystagamus." He concluded that appellee was intoxicated on alcohol and also concluded that she might have other intoxicants in her system because of the vertical nystagmus.[3]

---

2. Appellee's injuries included two broken arms, a broken leg, a broken collar bone, damage to her colon, intestines, and liver, and internal bleeding.

3. Hospital laboratory reports indicate cocaine and marijuana.

Hernandez took the blood specimen and headed for the medical examiner's (ME) office. On the way, Marines called him on his cell phone and told him that there was a problem with the specimen. Hernandez spoke with his lieutenant, then returned to the hospital and picked up the second specimen. He then went to the ME's office and put both specimens, labeled 1 and 2, into a refrigerated lockbox.

On cross-examination, Hernandez agreed that the standards for the administration of sobriety tests are set by the National Highway Traffic and Safety Administration (NHTSA). He also agreed that those standards require that, before performing an HGN, he was supposed to inquire about past or present head injuries and current medications, both of which can affect an HGN. Faced with a subject who had just been in a fatal collision and who was hooked up to an IV, he asked none of the required questions. He also conceded that HGN standards specify a subject standing with arms at the sides and that appellee was lying flat on a gurney; he administered an HGN anyway. He conceded that she followed his instructions, indicating normal use of mental faculties.

### Nurse Pope

Nurse Penny Pope testified that she drew blood from appellee's left arm for the deputies and the hospital laboratory at the same time. She stated that appellee had an IV in her left wrist that had been in place when appellee arrived at the hospital, presumably inserted by the EMTs who transported appellee from the scene of the collision. The vial for hospital tests were sent to the hospital laboratory, which rejected it as "contaminated" and asked for another specimen. She repeated the draw, 50 minutes later and using appellee's right arm, again drawing for the hospital and the deputies at the same time. She also testified that, until after the second draw, appellee received no pain medication to her knowledge and that this was the usual practice; pain killers can lower blood pressure that is already low because of trauma even further and cause death.

For the purposes of the suppression hearing, the trial court admitted hospital laboratory results for the second draw only.

### Danielson, ME's office

Terry Danielson, a toxicologist in the ME's office, testified that both specimens were tested using gas chromatography. When questioned by the state about dilution of blood with saline, he testified that he had seen, in the literature, an example in which a man was given two liters of saline and "it resulted in a 4 percent dilution." He opined that he would not be able to distinguish between such diluted blood and undiluted blood.[4]

### Dr. Lykissa

Appellee called Ernest Lykissa, the scientific director of ExperTox Laboratories in Houston. He testified that he holds both Ph.D. and M.D. degrees, teaches at Baylor College of Medicine, and works with law enforcement and state and federal agencies on toxicology issues and protocols. Before the hearing, he had reviewed appellee's medical records in regard to her injuries from the collision except for the EMS records.

He agreed with Pope that saline and lactate are given to trauma patients to

4. There was testimony that appellee was receiving .25 liter of saline per hour. Assuming that the collision occurred around 7:00 p.m., appellee had received about .375 liters in the 1 ½ hours preceding the first draw and about .625 liters by the time of the second draw. Both are far smaller than the 2 liters cited by Danielson, yet the blood-alcohol results derived by the ME's laboratory doubled from the first sample (.08) to the second (.16).

hydrate them and make up for blood volume lost to bleeding. He explained that the hospital laboratory rejected the first draw because elevated levels of sodium, potassium, and glucose—levels that "were not consistent with human life"—indicated contamination.

Lykissa testified at length about homeostasis—equilibrium—in a human body. He opined that introducing saline would disrupt homeostasis for about two hours after the IV was removed, but that homeostasis could be delayed beyond that time by concurrent stressors, such as bleeding and active trauma.

With regard to blood-alcohol levels, Lykissa noted that alcohol has a high affinity for water. As a result, alcohol that has been absorbed by tissue, and that would normally remain there for a period of time during burn-off, migrates into the preferred water/salt solution being pumped into the body via the IV. This raises the alcohol level in the blood/saline mixture beyond what it would be if the body were uninjured and in homeostasis.

In appellee's case, she had been receiving saline since about 7:00 p.m. She continued to receive saline in the 50 minutes between draws and, at the same time. She continued to bleed internally from tears in her colon. Lykissa testified that he believed that the second draw was also "contaminated" because of the continued IV saline and the concurrent and continuing effects of her injuries.

Lykissa also testified that he was certified to administer HGN, which he uses to look for head injuries in trauma patients. He stated that, according to NHTSA standards, a valid test requires a standing subject.

Questioning by the state clarified that hospital laboratories and law-enforcement laboratories use laboratory tests in different ways and for different purposes. For hospitals, a degree of inaccuracy is an acceptable trade-off for rapid results that enable timely treatment. The opposite is true for law-enforcement laboratories; they have little time pressure and a greater need for a higher degree of accuracy.[5]

The trial court also briefly questioned Lykissa for clarification on the migration of alcohol from tissue to saline. Lykissa's final answer on redirect examination was that when a foreign substance, in this case saline, is mixed into blood, the integrity of the blood specimen is compromised and "you cannot have a valid specimen." In his opinion, both specimens were compromised.

### Argument

Appellee argued to the trial court that it was an issue of admissibility, not weight. Neither side contested that the first draw was invalid—the hospital laboratory had said so. But, "just because the second one might not be as bad as the first one, it is still compromised ...," by the additional 50 minutes of saline drip.

The state argued that it was an issue of weight, not admissibility; the jury should be the fact finder.

The trial court ruled on appellee's suppression motion pursuant to Rule 702 and found that the first draw was not reliable and suppressed it, but allowed the second draw. It then addressed appellee's motion to suppress pursuant to § 724.012(b). The state argued that the second draw was merely a continuation of the first. The trial court found that one "stick" is one specimen; a second "stick" is a separate

---

**5.** Even so, Danielson testified that plus or minus 5% is an acceptable margin of error in the ME's laboratory.

specimen. It then granted appellee's motion to suppress the second draw, impliedly holding that "a" means "one." The trial court also stated that, whatever it did, the decision would be appealed and that it would leave another interpretation to "a higher authority."

## Discussion

One issue here is requiring that the specimen be "usable." The question is: usable by whom and for what purpose? The only penal context of "usable" that I am aware of is "a usable quantity" of marijuana. The definition of "usable" in HEALTH AND SAFETY CODE § 481.121 is easily discerned; if it's enough to smoke, it's usable. What is "usable" to a hospital laboratory for a quick-and-dirty, time-critical scan may not be "usable" at the level of accuracy necessary for proof beyond a reasonable doubt. Which "usable" do we use?

A second issue is that we are to use the plain language of the statute in making our rulings. *Boykin v. State*, 818 S.W.2d 782 (Tex.Crim.App.1991). Presumably, the legislature recognized the difference between "a" and "one or more" and the markedly different level of invasiveness between a voluntary blood specimen and an forcible one. "A" is not ambiguous. To say that the legislature, recognizing those differences, intentionally selected those terms for the two subsections does not produce an absurd result, nor can we say that it produces a result that the legislature could not possibly have intended. If it was an oversight or a mistake, the legislature is free to amend § 724.012(b). Until then, we are bound by "a."

The decision of the court of appeals should be affirmed. Because the Court does not do so, I respectfully dissent.