

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00378-CR

ROGELIO MUNGUIA                                                          APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

----------

### FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 12-00163

----------

### MEMORANDUM OPINION[1]

----------

In one issue, Appellant Rogelio Munguia appeals his conviction for driving while intoxicated. Tex. Penal Code Ann. § 49.04(a) (West Supp. 2015). We reverse the trial court's order denying Munguia's motion to suppress and the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.

---

[1]See Tex. R. App. P. 47.4.

## I. Background

On August 14, 2011, Jesus Diaz was driving south on Henderson Avenue in downtown Fort Worth when he observed an older-model, red Chevrolet pickup truck swerving in nearby lanes.[2]  At one point, the pickup swerved into Diaz's lane and almost collided with his vehicle.  As the pickup continued to swerve across the lanes, Diaz suspected the driver was intoxicated.  When his attempt to catch the attention of a police officer leaving the police station located at Magnolia and Hemphill proved unsuccessful, Diaz called 911, informing the operator that a pickup was driving on the wrong side of the road, swerving, and speeding through residential neighborhoods.[3]  The operator informed Diaz that a police officer was being dispatched, and while the officer was en route Diaz continued following the pickup while he remained on the phone with the 911 operator and described the direction that the vehicles were taking through the neighborhood.[4]

The pickup eventually came to a stop in the driveway of a house on Ryan Avenue.  Diaz drove past the house and then executed a U-turn while maintaining eye contact with it.  Diaz described the driver as an older Hispanic male wearing a white or light-colored shirt.  His wife described the driver as an older man wearing a white t-shirt and blue or black pants.  Munguia was exiting

---

[2]Diaz's wife, son, and stepson were in the car with him.

[3]The 911 tape was admitted into evidence and played for the jury.

[4]The State admitted maps of the route described by Diaz into evidence.

the pickup just as Fort Worth Police Officer Cody Norman arrived. No one else was observed either inside or outside of the pickup. Diaz identified the driver to Officer Norman by pointing at him.[5]

As Officer Norman approached Munguia to ask for his driver's license, he immediately noticed indications of intoxication. Not only did Munguia hold on to the pickup to steady himself as he exited the vehicle, he also continued to hold on as he walked toward the officer at the rear of the pickup. Officer Norman could also smell alcohol coming from Munguia and could see that Munguia's eyes were bloodshot and watery.

Because of a language barrier, Officer Norman had difficulty communicating with Munguia.[6] Officer Norman attempted to call a Spanish-speaking officer to the scene to help translate,[7] but in the meantime one of Munguia's neighbors came outside and assisted in translating. Officer Norman managed to administer a Horizontal Gaze Nystagmus (HGN) test and observed all six clues, indicating intoxication. However, according to the officer, the language barrier prevented him from obtaining consent from Munguia to conduct any additional tests.

---

[5]At trial, Diaz also identified Munguia as the driver of the pickup truck.

[6]Munguia primarily spoke Spanish, and Norman knew very little Spanish.

[7]Officer Norman received no response to his request.

3

After Officer Norman placed Munguia under arrest, he learned from dispatch that Munguia had two prior convictions for DWI. Officer Norman transported Munguia directly to John Peter Smith Hospital (JPS) to obtain a blood draw, where a Spanish-speaking officer, Todd Allen, read the Spanish version of the DIC-24 warnings[8] to Munguia and asked him to consent to the taking of a blood sample. After Munguia refused, Officer Norman completed a THP-51 form[9] and Ben Smit, a JPS nurse, obtained a blood specimen from Munguia without a warrant or his consent.

Officer Norman testified that his only basis for performing the mandatory blood draw was that Munguia had been convicted of DWI twice before. Munguia's blood test showed a blood alcohol concentration of 0.18.[10]

Munguia moved to suppress the evidence of the blood test on the basis of *Missouri v. McNeely*, 133 S.Ct. 1552 (2013). The State did not present any evidence or argument that exigent circumstances justified the warrantless blood

---

[8]The DIC-24 is the Texas Department of Public Safety's standard form containing the written warnings required by the transportation code to be read to an individual arrested for DWI before a peace officer requests a voluntary blood or breath sample from a person. *See* Tex. Transp. Code Ann. § 724.015 (West Supp. 2015); *State v. Neesley*, 239 S.W.3d 780, 782 n.1 (Tex. Crim. App. 2007).

[9]Form THP–51 is the statutory authorization form that allows a peace officer to require that a hospital perform a mandatory blood draw. *See* Tex. Transp. Code Ann. § 724.012(b) (West 2011); *Neesley*, 239 S.W.3d at 782 n.2; *Whitaker v. State*, No. 05-12-01116-CR, 2013 WL 5969560, at *2 n.2 (Tex. App.—Dallas Nov. 7, 2013, no pet.) (not designated for publication).

[10]The legal limit is 0.08. *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011).

4

draw, but relied entirely upon section 724.012 of the transportation code.[11]  Tex. Transp. Code Ann. § 724.012.  The trial court denied the motion to suppress. After the jury convicted Munguia of DWI, he was sentenced to 10 years' confinement.

## II.  Motion to Suppress

In his only issue, Munguia argues his Fourth Amendment rights were violated when Officer Norman forced him to provide a blood sample without first obtaining a warrant.

### A.  Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at

---

[11]Nor did the State argue on appeal that exigent circumstances independent of section 724.012 existed in this case. Because there was no evidence presented regarding exigent circumstances, we conclude the blood draw could not have been justified based upon exigent circumstances.  *See, Moser v. State*, PD-0662-15, 2016 WL 2016 WL 325435, *2 (Tex. Crim. App. Jan. 27, 2016) (stating that a reviewing court should address whether a warrantless blood draw was justified based upon exigent circumstances if it sustains a challenge on the basis of a *McNeely*-based claim).

673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

## B. Analysis

The court of criminal appeals has held that warrantless blood or breath samples taken without consent solely in reliance on transportation code provisions such as section 724.012 violate the warrant requirement of the Fourth Amendment. *State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178, at *20 (Tex. Crim. App. Nov. 26, 2014).[12] Officer Norman's reliance upon section 724.012 for the warrantless, nonconsensual blood draw and his good-faith belief that the statute authorized the warrantless search do not overcome the exclusionary rule. *Lewis v. State*, No. 02-13-00416-CR, 2015 WL 1119966, at *2 (Tex. App.—Fort Worth Mar. 12, 2015, pet. filed) (mem. op., not designated for publication) (citing *Burks v. State*, 454 S.W.3d 705, 709 (Tex. App.—Fort Worth 2015, no pet.)). Consequently, the trial court, ruling without the benefit of *Villarreal*—which was issued almost three months after the suppression hearing—erred in its application of the law to the facts of this case and, thus, in denying Munguia's motion to suppress. *See id.*

---

[12]At the time this case was submitted, the court of criminal appeals had granted rehearing of the *Villarreal* decision. But on December 16, 2015, the court of criminal appeals concluded that rehearing was improvidently granted and denied the State's motion for rehearing. *Villarreal*, 2014 WL 2367150.

### III. Harm Analysis

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. Because the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a). The question is whether the trial court's erroneous denial of Munguia's motion to suppress was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

We are directed that our harmless error analysis should not focus on the propriety of the outcome of the trial. Instead, we must calculate, as much as possible, the probable impact of the evidence on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on

7

the error.  *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)).  This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner and not "in the light most favorable to the prosecution."  *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22.

The jury heard the testimony of Officer Norman, Smit, and Jason Allison, a forensic scientist who tested Munguia's blood, about the blood draw and the test results.  The jury was also presented with evidence that Munguia's blood alcohol content on the night of August 14, 2011, was .18, more than twice the legal limit of .08. *See* Tex. Penal Code Ann. § 49.01(2)(B).  The State emphasized this in its closing argument, arguing, "And you know . . . , despite cross-examination of the defense, you can't poke holes in that, this defendant was more than twice the legal limit at the time the blood was drawn."  The State argued further, "This man was intoxicated based on this blood alcohol content.  It's that plain and simple." Finally, the State argued:

> And you take all of that together, and then you have Mr. Allison get on the stand to tell you that the blood out of that man's body was a 0.18.  And, in fact, it was more like 0.185.  But a .18.  Over two times the legal limit.  That corroborates the fact that he was driving in the first place.

While the jury also heard the testimony of Jesus Diaz, identifying Munguia and describing his erratic driving behavior, and evidence of a strong odor of alcohol, red, bloodshot eyes, unsteady balance, and the presence of all six clues

8

of the HGN test, we cannot conclude beyond a reasonable doubt that the blood-alcohol evidence did not contribute to the jury's verdict. Given the emphasis placed on those results throughout the trial, we hold that it is likely that the jury gave substantial weight to it.

Having carefully reviewed the record and performed the required harm analysis under rule 44.2(a), because we are unable to determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment, *see Williams*, 958 S.W.2d at 195, we sustain Munguia's sole issue. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Because we hold that the trial court erred by denying Munguia's motion to suppress and that there is a reasonable possibility that this constitutional error contributed to Munguia's conviction or punishment, we reverse the trial court's order denying Munguia's motion to suppress and the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: GARDNER, MEIER, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 4, 2016

9