

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

**WR-73,484-02**

---

**Ex parte NEAL HAMPTON ROBBINS, Applicant**

---

**ON STATE'S MOTION FOR REHEARING
ON APPLICATION FOR A WRIT OF HABEAS CORPUS
CAUSE NO. 98-06-00750-CR(2) IN THE 410TH DISTRICT COURT
MONTGOMERY COUNTY**

---

**RICHARDSON, J., filed a concurring opinion in which JOHNSON, J., joined.**

## CONCURRING OPINION

I concur in this end result — that Applicant, Neal Hampton Robbins, be granted relief

in the form of a new trial because the State's expert witness has since changed her opinion

regarding the cause of Tristin Rivet's death.   But I do not join the majority because I do not

agree that resurrecting the Court's 2014 opinion is the best way to accomplish that end result.

Instead, I would hold that Applicant is entitled to relief under the newly amended version of

Article 11.073,[1] which clearly and unambiguously speaks directly to Applicant's right to relief in this case.

I was not on this Court in 2011 and 2014 when the *Robbins I* and *Robbins II* opinions were issued. I voted to grant rehearing on *Robbins II* along with a majority of this Court. At the time, a motion for rehearing and a motion to reconsider on the court's own motion were pending in *Robbins I* and *II*. In order to fully consider the merits of both motions at the same time, I voted to grant rehearing in *Robbins II* (reconsideration of *Robbins I* is still unresolved). Had I been on the Court in 2014, I would have likely followed the logic set out by the three dissenting judges, Presiding Judge Keller, Judge Keasler, and Judge Hervey. I agree with them that the phrase "the scientific knowledge or method on which the relevant scientific evidence is based" refers to general science, not the testifying expert's particular knowledge or method of doing things. That is the very reason why I cannot join today's majority opinion deciding that we improvidently granted the State's motion for rehearing. I don't think that we did improvidently grant rehearing. It is my position that, since relief is clearly warranted under the amended Article 11.073, as detailed in this concurring opinion, the better approach is to resolve this case under the amended statute without having to resurrect the 2014 opinion.

---

[1] Act of June 20, 2015, 84th Leg., R.S., ch. 1263, H.B. 3724 (codified as an amendment to TEX. CRIM. PROC. CODE art. 11.073(d)). This act took effect September 1, 2015.

## BACKGROUND

In 1999, a jury found Applicant, Neal Hampton Robbins, guilty of the capital murder of his girlfriend's seventeen-month-old daughter, Tristin Rivet. The State did not seek the death penalty, and upon conviction Applicant was sentenced to life in prison. This Court affirmed the judgment and sentence on direct appeal.[2] The relevant facts and procedural background have not changed since Applicant's first application for habeas corpus was denied by this Court in 2011.

### A.     The Trial

Tristin Rivet was a seventeen-month old girl, living with her mother, Barbara Hope, and Applicant (Hope's boyfriend).   On the day of her death, Tristin was left in Applicant's care. Around approximately 3:30 p.m., Applicant spoke to Hope by phone and told her to hurry back to the house because he "had to go and had things to do." Applicant told Hope when she arrived home that he had laid Tristin down for a nap shortly after they spoke on the telephone, and Applicant departed. At approximately 6:00 p.m., Hope checked on Tristin and found that her body was cold and that she was not breathing. Hope attempted to revive Tristin, then carried her outside, where she laid Tristin down and called for help. Others attempted to perform CPR on Tristin, but were stopped by a neighbor who told them that they were performing CPR too forcefully, given the size of the child. An ambulance arrived at 6:08 p.m., and after several unsuccessful attempts to revive Tristin, a breathing tube was

---

[2] *Robbins v. State*, 88 S.W.3d 256 (Tex. Crim. App. 2002).

inserted into Tristin's larynx. Fire department personnel performed CPR and administered epinephrine during the trip to the hospital. Tristin arrived at the hospital at 6:36 p.m., and she was immediately examined by Dr. John Conner, who determined that Tristin "had been dead for some time."

Justice of the Peace Edie Connelly ordered an autopsy that was performed by assistant medical examiner Dr. Patricia Moore with the Harris County Medical Examiner's Office (HCMEO). Dr. Moore noted bruises and other markings and areas of discoloration. She also found hemorrhages underneath the bruising. When examining Tristin's internal organs, Dr. Moore discovered petechiae (small areas of hemorrhage). At trial, Dr. Moore, as the State's expert witness, testified that the cause of Tristin's death was asphyxia due to compression of the chest and abdomen and that the manner of death was homicide. Dr. Moore ruled out CPR as the cause of death because the injuries to Tristin's back were inconsistent with the administration of adult CPR and the injury to the kidney was deep down, requiring a lot of force. She also excluded sudden infant death syndrome (SIDS) because of the child's age "and the story doesn't fit the picture of a SIDS baby death." Additionally, Dr. Moore stated that Tristin may have been dead for at least three hours before her temperature was taken at the hospital, based upon an approximate post-mortem cooling rate of 1.5 degrees per hour, and that Tristin's body would not have sustained bruises as the result of the application of CPR that long after her death.

To contravene Dr. Moore's testimony, the defense called Dr. Robert Bux, the deputy chief medical examiner for Bexar County, Texas.[3] Dr. Bux testified that the cause of Tristin's death could not be determined and that no anatomical reason demonstrated during the autopsy could have led to a specific cause of her death. In its rebuttal case, the State offered evidence to contradict Dr. Bux's testimony.

Applicant testified in his defense. He stated that Tristin was affectionate toward him and that on the day of her death, he did nothing to harm Tristin. In fact, he claimed that he had never struck her, abused her, disciplined her, or even raised his voice to her. Yet he admitted causing the injuries that resulted in Tristin's bruises, blaming the incidents on his "carelessness."

During closing arguments, the State emphasized Dr. Moore's testimony in arguing that it was Applicant, and only Applicant, who could have caused the asphyxia-related death of Tristin. On February 22, 1999, the jury found Applicant guilty of capital murder, and Applicant was sentenced to life imprisonment. Approximately one month later, Applicant filed a motion for new trial, arguing that evidence was legally and factually insufficient to establish that Tristin's death was a homicide, but the trial court denied the motion.

---

[3] Bux agreed that SIDS does not apply to this case. He also noted that Tristin did not die from poisoning, as per the toxicology report.

**B.      Reevaluation of Autopsy Findings**

    1.      Dr. Dwayne Wolf

In March 2007, an acquaintance of Applicant contacted the Harris County Medical Examiner's Office and asked it to review Dr. Moore's (the medical examiner who conducted the autopsy and testified as the State's expert at trial) findings regarding the cause of Tristin's death.  Dr. Dwayne Wolf, the deputy chief medical examiner for Harris County,  undertook a re-evaluation of the autopsy findings.  After reviewing the testimony adduced during Applicant's trial, the autopsy report, the EMS and medical records, and the police offense report, Dr. Wolf concluded that Dr. Moore's observations during the autopsy did not support a finding that the death resulted from a homicide, but rather that the cause of death was "undetermined."  Consequently, on May 2, 2007, Dr. Wolf amended Tristin's autopsy report to reflect that both the cause and manner of death was "undetermined."

    2.      Dr. Joye Carter

On the following day, May 3, 2007, presumably due to the amended autopsy report, Judge Edie Connelly, Justice of the Peace Precinct 3 of Montgomery County, whose office handles Autopsy Reports and Death Certificates, formally reopened the inquest into  the cause of Tristin's death.  Shortly thereafter, the Montgomery County District Attorney's Office asked former Harris County Medical Examiner Joye Carter to review Dr. Moore's autopsy report.  Dr. Carter had been Dr. Moore's supervisor when Dr. Moore performed the autopsy, and Dr. Carter had agreed with Dr. Moore's original opinion that the death was

caused by asphyxiation by compression—a homicide. In a May 10, 2007 letter to the Montgomery County District Attorney, Dr. Carter wrote, "Upon my review of this case I would not concur with the opinion on the manner of death as a homicide but would reconsider this case as an undetermined manner," and "If the Harris County Medical Examiner intends to re-rule this case as an undetermined manner of death I would agree with that change."

3.     Dr. Patricia Moore

Dr. Moore was also asked by the Montgomery County District Attorney's Office to review her autopsy report. In a May 13, 2007 letter to the District Attorney, she stated:

> I believe that there are unanswered questions as to why the child died, and I still feel that this is a suspicious death of a young child. Given my review of all the material from the case file and having had more experience in the field of forensic pathology, I now feel that an opinion for a cause and manner of death of undetermined, undetermined is best for this case.

Dr. Moore explained that, since her original opinion, she has had more experience, and she has reviewed additional information that suggested that the bruises could have resulted from aggressive CPR and other efforts to assist the child.

**C.     Applicant's First Article 11.07 Application For Writ of Habeas Corpus**

Armed with this new information regarding Dr. Moore's change of opinion, on June 4, 2007, Applicant filed his first writ application under Article 11.07,[4] with the 410th District Court of Montgomery County. Applicant alleged that Dr. Moore's false testimony was

---

[4] TEX. CODE CRIM. PROC. art. 11.07.

newly discovered evidence.[5] Applicant alleged that "[n]ewly discovered evidence shows that no rational juror would find Applicant guilty beyond a reasonable doubt of the offense for which he was charged and convicted." Shortly thereafter, Applicant filed a supplemental application alleging that his "right to a fair trial by a fair and impartial jury . . . was violated because his conviction was based on testimony material to the State's case that has now been determined to be false."

In its original response to Applicant's first writ application, the State recommended that Applicant be granted a new trial because his due process rights to a fair trial and impartial jury were violated. The State claimed that, because it relied on Dr. Moore's original opinion in presenting its case, which has now been recanted, confidence in the outcome has been undermined. Citing to *Ex parte Carmona*,[6] the State wrote, "While Dr. Moore's testimony is not perjured testimony, the effect of the change in her opinion is the same—the jury was led to believe and credit facts that were not true." Applicant and the State filed agreed findings of fact and conclusions of law.

1.    Dr. Thomas Wheeler

Instead of signing the agreed findings recommending that relief be granted, on August 22, 2007, Judge Michael Mayes, Judge of the 410th District Court, who presided over the trial

---

[5] *Ex parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011) (*Robbins I*). WR-73,484-01 was filed with the trial court on June 4, 2007, and received by this Court on February 12, 2010. When the writ application was filed and set for submission by this Court on December8, 2010, WR-73,484-01 was assigned the case number, AP-76,464.

[6] 185 S.W.3d 492 (Tex. Crim. App. 2006).

and who was presiding over the habeas proceedings, appointed Dr. Thomas Wheeler, the

Chairman of the Department of Pathology at Baylor College of Medicine, with the task of

conducting an independent pathological examination to address the following issues:

(1)     What was the manner of Tristin Rivet's death?

(2)     What was the means of Tristin Rivet's death?

(3)     Are the manner and means of Tristin Rivet's death able to be determined?

(4)     Does a change in the medical examiner's opinion about the manner and means of Tristin Rivet's death entitle Applicant to a new trial?

After reviewing the autopsy report, trial testimony, and exhibits, Dr. Wheeler

concluded in a September 18, 2007, letter to the trial court that the cause and manner of

Tristin's death were undetermined.  Dr. Wheeler asserted that "[a]lthough the autopsy

performed by Dr. Moore was thorough and well documented, her conclusion that the death

of Tristin Rivet was caused by asphyxia secondary to chest compressions was not justified

by the objective facts and pathological findings in this case."  He could not rule out

suffocation or asphyxiation as the cause of death, but he did not see any physical findings

that would support any particular conclusion as to the cause of death.

2.     Dr. Linda Norton

In September of 2007, Dr. Linda Norton, a Forensic Pathologist in Dallas, was asked

by the Montgomery County Sheriff's Office Cold Case Squad "to review this case, in an

attempt to form an opinion regarding cause and manner of death."[7] On March 28, 2008, Dr. Norton reported the results of her review during a recorded telephone conference call. Those present for the conference call were Detective Tommy Duroy (with the Montgomery County Sheriff's Office), Gail McConnell (with the District Attorney's Office), Brian Wice (Applicant's attorney), and Judge Edie Connelly (who was handling the inquest), Lt. Damon Hall (with the Sheriff's Office Crime Lab), and Terance Greenwood (Det. Duroy's partner in the Cold Case Squad). Dr. Norton stated that it was her opinion that Tristin's death was a homicide and that the manner of death was asphyxia by suffocation. She explained that her conclusion was supported by the petechial hemorrhages on Tristin's lungs and thymus, combined with the other evidence of trauma, and in the context of the other circumstances of Tristin's death. In addition, Dr. Norton stated that the correct rule of thumb for assessing temperature loss in a child's body after death is an approximate loss of three degrees per hour, depending upon ambient temperature and other environmental facts. Thus, combining that with Tristin's maximum rectal temperature of 94 degrees at the hospital and the descriptions of Tristin's condition by Sullivan and others, she believed that Tristin's death occurred between 2:30 and 5:00 p.m. Consequently, because the child had been dead for at least an hour before CPR was attempted, the external bruises observed during the autopsy could not have been inflicted during the CPR. Nonetheless, Dr. Norton acknowledged that

---

[7] Affidavit of Linda E. Norton, M.D., dated May 14, 2008. Dr. Norton was paid $22,907.50 from Montgomery County general funds, the district attorney's forfeiture account, and funds budgeted to the sheriff's cold case investigation squad.

she could not conclude beyond a reasonable doubt that Applicant, alone, committed the homicide.

Dr. Norton also recommended that authorities investigate reports that Applicant had written something on a dollar bill and placed it in Tristin's casket at the funeral home on the date of Tristin's funeral. Ruth Hope (Barbara Hope's mother) and Shelby Becker (Barbara Hope's sister) had executed affidavits indicating that they saw Applicant writing something on a money bill and then placing it in Tristin's coffin.

On April 4, 2008, as part of her inquest, Judge Connelly signed an order directing that Tristin's body be exhumed for the purpose of retrieving any evidence that might be found in the casket. Six days later, Tristin's remains were exhumed and remnants of a piece of paper resembling United States currency were recovered from the casket liner. Document preservation experts reported on May 6, 2008, that no markings of any kind could be identified due to the poor condition of the paper.

Although the autopsy report had been amended by Dr. Wolf to reflect that both the cause and manner of death was "undetermined," Judge Connelly amended Tristin's death certificate on May 13, 2008, to correspond with Dr. Norton's opinion that Tristin's death was caused by asphyxia due to suffocation, rather than asphyxia by compression. The "homicide" finding was not changed.

The following day, on May 14, 2008, Dr. Norton executed an affidavit regarding her findings, and this prompted the State to withdraw its previously agreed-upon

recommendation to grant relief. Although the State was no longer willing to recommend a grant, it agreed not to oppose Applicant's request for a new trial. In its supplemental response, the State wrote that the "cause of death remains asphyxiation, albeit by suffocation rather than compression, and the manner of death a homicide as presented by the jury at Applicant's trial."

On August 6, 2008, Dr. Wheeler submitted a sworn affidavit, repeating what he had said in his September letter to the trial court, adding that he disagreed with Dr. Norton's opinions.

3.     Additional Discovery

On August 19, 2008, Dr. Moore executed an affidavit incorporating the opinions she had expressed in the May 13, 2007 correspondence. After Dr. Moore's sworn affidavit, containing her explanation of why her opinion regarding the cause of death changed, was filed, the trial court (Judge Michael Mayes) ordered that the parties engage in discovery. Judge Mayes appointed John Milutin, an attorney experienced in the deposition of medical experts, to conduct the depositions of the forensic pathologists. Dr. Moore was deposed on December 10, 2008. Dr. Moore stated in her deposition that it was no longer her opinion that Tristin's death resulted from compression asphyxia, and she concurred in the decision to list the cause of death as "undetermined." Dr. Moore disagreed with Dr. Norton's conclusion that the petechiael hemorrhages of the thymus and lungs were "extremely specific" as indicators of the cause of death. Dr. Moore concurred with Dr. Wolf's opinion that the

observations made during the autopsy were not sufficient to determine a cause or manner of death. Dr. Wheeler was deposed on December 19, 2008, and Dr. Wolf was deposed on February 10, 2009. They, too, testified that they could not conclude with a reasonable degree of medical certainty that the cause and/or manner of Tristin's death was homicide.

Dr. Norton's deposition was scheduled for July 31, 2009. On July 14, 2009, Dr. Norton's daughter contacted counsel for the State and reported that a close personal friend of Dr. Norton's had passed away, and Dr. Norton could not participate in a deposition. On two subsequent occasions, Dr. Norton's daughter informed counsel for the State that Dr. Norton was suffering from health problems and had taken a leave of absence from her medical practice. On September 24, 2009, the State filed a motion for an evidentiary hearing and the issuance of a subpoena to require Dr. Norton's appearance. The trial court granted the State's motion to depose Dr. Norton at the location of her choosing; however, investigators could not locate Dr. Norton to serve the subpoena. Dr. Norton contacted counsel for the State by telephone, and said that she could not be deposed due to medical problems. On December 17, 2009, Dr. Norton submitted a second affidavit in which she confirmed that she was incapable of preparing for or participating in a deposition, and she adopted and ratified under oath the statements and opinions she expressed during the previous telephone conference, including that she believed Tristin died from suffocation and that her death was homicide.

Based largely on Dr. Norton's opinion, on December 22, 2009, the State filed its second supplemental response and recommended that relief be denied. Shortly thereafter, Applicant filed an objection to Dr. Norton's affidavit, arguing that, given her unwillingness to be deposed, the trial court should not consider her affidavit.

4.     Motion To Reopen Inquest

On December 7, 2009, Applicant filed a formal motion with Judge Connelly to reopen the inquest into the cause of Tristin's death and to permit consideration of additional expert medical testimony.  On December 29, 2009, Judge Connelly conducted an evidentiary hearing on Applicant's motion.  On January 6, 2010, Judge Connelly denied Applicant's motion to reopen the inquest, concluding in a written order that "on the basis of examination and investigation, in the opinion of this Court, the cause and manner of death of Tristin Skye Rivet, as shown on the amended death certificate dated 05/13/2008, is cause: asphyxia due to suffocation, manner: homicide."

5.     The Trial Court's Recommendation and This Court's Holding in *Robbins I*

On January 15, 2010, the State filed its proposed findings of fact and conclusions of law, which recommended that relief be denied. Days later, Applicant filed his proposed findings and conclusions. On January 21, 2010, the State filed its first supplemental brief in support of its proposed findings and conclusions. While not willing to concede that Applicant properly raised a due process claim in his supplemental ground for relief, the State argued that, even if he did raise due process, the Court "has not yet held—and it seems unlikely that

it will ever hold—that the Due Process Clause is violated when a witness provides, in good faith, an opinion that is believed to be true by both the witness and the prosecution at the time of trial, even if that opinion is subsequently challenged by other experts or reconsidered by the witness who offered it."

The next day, on January 22, 2010, the trial court permitted oral argument. Applicant argued that Moore's re-evaluation was newly available evidence and that *Ex parte Elizondo*[8] requires that the newly available evidence be evaluated within the four corners of the trial transcript.[9] Further, Applicant asserted that due process and fairness require that the jury have the opportunity to re-weigh the evidence. In contrast, the State contended that Applicant could not establish that he was actually innocent because the evidence is not newly discovered, the re-evaluation was not indisputable, and there was other evidence of Applicant's guilt. Regarding the due process claim, the State argued that Applicant had failed to raise it as a supplemental ground, and it doubted whether there was a legal and factual basis for his due process claim: "It's hard to believe that a violation of due process is established by evidence that an expert opinion may have been correct or it may have been incorrect."

---

[8] 947 S.W.2d 202 (Tex. Crim. App. 1996).

[9] Applicant stated that by "false evidence," he meant evidence that is "interchangeable with discredited, inaccurate, incorrect, invalid, unfounded, whatever term of art this Court chooses to use." He further noted that Dr. Moore's change of opinion was not a recantation but instead a reevaluation, so it deserved more deference.

The trial court made twenty-two pages of detailed findings of fact, much of which is summarized above, and five pages of conclusions of law. The trial court recommended that we grant Applicant a new trial because his due process and due course of law rights were violated, as was his right to an impartial jury.[10]

However, this Court denied relief (*Robbins I*), holding that Dr. Moore's testimony was not false at the time that she rendered her opinion at trial, and she did not create a false impression simply because the professional opinion she gave at trial had since changed upon further reflection and re-evaluation based on becoming a more experienced forensic pathologist. This Court held in *Robbins I* that Applicant's due process rights were not violated.[11]

## ARTICLE 11.073

### A.     The Original 2013 Version of Article 11.073

On September 1, 2013, the Texas Legislature enacted Article 11.073.[12] This prompted Applicant to file his second writ application on September 3, 2013, alleging the same factual

---

[10] The document containing the Trial Court's Findings of fact and Conclusions of Law, Recommendation and Order is dated January 22, 2010.

[11] *Ex parte Robbins*, 360 S.W.3d at 461-463 (holding that "Moore's trial testimony is not false just because her re-evaluation of the evidence has resulted in a different, 'undetermined' opinion. . . . Moore's trial testimony did not result in a false impression of the facts. . . . Moore testified openly about the autopsy findings and her professional opinion regarding the cause and manner of Tristin's death. . . . Moore explained the reasoning behind her original conclusions that Tristin's death was asphyxia-related. Also, neither Moore's conclusion nor the autopsy evidence upon which she relied has been entirely refuted by any expert.").

[12] Act of June 14, 2013, 83d Leg., R.S., ch. 410, §§ 1-3, sec. 11.073, 2013 Tex. Gen. Laws 1196 (amended 2015) (current version at Tex. Code of Crim. Proc. art. 11.073).

basis for relief as he did in his first writ application—Dr. Moore's change of opinion regarding the cause of Tristin's death. However, in this second application, Applicant invokes Article 11.073 as a new *legal* basis for relief.

The original 2013 version of Article 11.073 provides as follows:

> (a) This article applies to relevant scientific evidence that:
>
> > (1) was not available to be offered by a convicted person at the convicted person's trial; or
> >
> > (2) contradicts scientific evidence relied on by the state at trial.
>
> (b) A court may grant a convicted person relief on an application for a writ of habeas corpus if:
>
> > (1) the convicted person files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:
> >
> > > (A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and
> > >
> > > (B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and
> >
> > (2) the court makes the findings described by subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.

(c)     For purposes of Section 4(a)(1), Article 11.07, Section 5(a)(1), Article 11.071, and Section 9(a), Article 11.072, a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.

(d)     In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:

    (1)     the applicable trial date or dates, for a determination made with respect to an original application; or

    (2)     the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

On November 26, 2014, this Court rendered its opinion on Applicant's second writ application, holding that "[Dr.] Moore's revised opinion on the cause of death satisfies the requirements to be called 'scientific knowledge,' and thus falls within the language of Article 11.073."[13]  Applicant was therefore granted relief pursuant to Article 11.073 (*Robbins II*).

---

[13] *Ex parte Robbins*, WR-73,484-02, 2014 WL 6751684, *10 (Tex. Crim. App. Nov. 26, 2014) (*Robbins II*).

However, on May 13, 2015, this Court granted the State's motion for rehearing in

*Robbins II*, which made Applicant's second writ application, filed on September 3, 2013,

once again a pending writ application.

**B.    The 2015 Amendment to Article 11.073**

While this writ was pending before the Court on the State's motion for rehearing, on

September 1, 2015, Article 11.073 was amended by House Bill 3724.[14] House Bill 3724

provides as follows (the underlined portions of the statute reflect the changes that were made

to Article 11.073):

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.   Article 11.073(d), Code of Criminal Procedure, is amended to read as follows:

(d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the <u>field of</u> scientific knowledge<u>, a testifying expert's scientific knowledge,</u> or <u>a scientific</u> method on which the relevant scientific evidence is based has changed since:

(1) the applicable trial date or dates, for a determination made with respect to an original application; or

(2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

SECTION 2.  This Act takes effect September 1, 2015.

---

[14] Act of June 20, 2015, 84th Leg., R.S., ch. 1263, H.B. 3724 (codified as an amendment to TEX. CRIM. PROC. CODE art. 11.073(d)).

The House Criminal Jurisprudence Committee's Bill Analysis of House Bill 3724[15]

contains the following information reflecting the intent behind the passage of the 2015

Article 11.073 amendment:

BACKGROUND AND PURPOSE
Informed observers note that current law allows for the reexamination of certain cases based on new scientific evidence and requires a court, in finding whether new scientific evidence exists, to consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed. *The observers contend that a recent Texas Court of Criminal Appeals opinion held that a change in the scientific knowledge of a testifying expert would be a basis for habeas relief under the law. C.S.H.B. 3724 seeks to codify this decision.*

CRIMINAL JUSTICE IMPACT
*It is the committee's opinion that this bill does not expressly create a criminal offense, increase the punishment for an existing criminal offense or category of offenses, or change the eligibility of a person for community supervision, parole, or mandatory supervision.*

RULEMAKING AUTHORITY
It is the committee's opinion that this bill does not expressly grant any additional rulemaking authority to a state officer, department, agency, or institution.

ANALYSIS
C.S.H.B. 3724 amends the Code of Criminal Procedure to require a court that is hearing an application for a writ of habeas corpus based on certain issues with respect to scientific evidence that either was not available to be offered by a convicted person at trial or contradicts scientific evidence relied on by the state at trial, in making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, to consider, among other possible changes, *whether a testifying expert's scientific knowledge has changed since the applicable trial date or dates,* for a determination made with respect to an original application, or since

---

[15] House Committee on Criminal Jurisprudence, Bill Analysis Report on H.B. 3724, 84th, R.S. (2015) *available at* http://www.legis.state.tx.us/tlodocs/84R/analysis/pdf/HB03724H.pdf#navpanes=0.

the date on which the original application or a previously considered application, as applicable, was filed for a determination made with respect to a subsequent application. The bill specifies that the change in scientific knowledge that the court is required to consider is a change in the field of scientific knowledge.

EFFECTIVE DATE
September 1, 2015[16]

Significantly, the "Enrolled Bill Summary" of House Bill 3724,[17] provides that "House Bill 3724 amends the Code of Criminal Procedure *to expand* the factors a court must consider when making a finding as to whether scientific evidence constituting the basis for an application for a writ of habeas corpus was not ascertainable."[18]

**ANALYSIS**

**A.    The Applicability of the 2015 Version of Article 11.073 to Applicant's Claim For Relief**

Applicant filed this second writ application on September 3, 2013, which was after Article 11.073 was enacted, but before the effective date of the September 1, 2015 amendment to Article 11.073. Since the time that Applicant filed his second writ application, there has been no new factual development in the case. Everything this Court needs to resolve Applicant's claim for relief brought in his second writ application is before the Court. Nothing has changed since September 3, 2013 *except* Article 11.073, which was amended

---

[16] *Id.* (emphasis added).

[17] Enrolled Bill Summary of H.B. 3724, 84th, R.S. (2015) *available at* http://www.legis.state.tx.us/BillLookup/BillSummary.aspx?LegSess_84R&Bill_HB3724.

[18] *Id.* (emphasis added).

on September 1, 2015 "to expand the factors" supporting relief to include a change in the "testifying expert's scientific knowledge." In fact, the State's attorney conceded at the outset of his oral argument before this Court that he has "never had the Legislature respond to [a] motion for rehearing by passing an enactment that potentially invalidates [his] motion." Since we are supposed to "seek to effectuate"[19] the intent of the legislators who enact a statute, and since the intent behind the amended language in Article 11.073 is clearly aimed toward providing an avenue of relief for Applicant, granting such relief to Applicant under the amended statute is the logical solution. However, rather than address the issue of the amendment's applicability—i.e., whether the Court can consider the claims raised in Applicant's second writ application under the newly amended version of Article 11.073, which came into effect during the thirteen-month-long period since the State filed its motion for rehearing—the majority of this Court, which includes three of the Judges who had dissented to the 2014 opinion, has instead chosen to go back to the 2014 opinion.

It is true that there is no provision in the 2015 amendment addressing the applicability of the amended statute to a pending writ application, even though the Legislature could have easily put such a provision into the amendment. Yet, by the same token, had the Legislature intended the 2015 amendment to apply only prospectively—to writs filed after the effective

_____

[19] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

date—it could have included such a provision in the amendment, as it did in the original enactment of Article 11.073 on September 1, 2013.[20]

In *Boykin v. State* we held that:

[w]hen we interpret statutes . . . we seek to effectuate the "collective" intent or purpose of the legislators who enacted the legislation. We do so because our state constitution assigns the law *making* function to the Legislature while assigning the law *interpreting* function to the Judiciary.

\*\*\*

. . . "Where the statute is clear and unambiguous, the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute."

There is, of course, a legitimate exception to this plain meaning rule: where application of a statute's plain language would lead to absurd consequences that the Legislature could not *possibly* have intended, we should not apply the language literally. When used in the proper manner, this narrow exception to the plain meaning rule does not intrude on the lawmaking powers of the legislative branch, but rather demonstrates respect for that branch, which we assume would not act in an absurd way.

If the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then *and only then*, out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such *extra*textual factors as executive or administrative interpretations of the statute or legislative history.[21]

---

[20] Section 2 of S.B. 344 provides that, "[t]he change in law made by this Act applies only to an application for a writ of habeas corpus filed on or after the effective date [September 1, 2013] of this Act. An application for a writ of habeas corpus filed before the effective date of this Act is governed by the law in effect at the time the application was filed, and the former law is continued in effect for that purpose." Act of June 14, 2013, 83d Leg., R.S., ch. 410, §§ 1-3, sec. 11.073, 2013 Tex. Gen. Laws 1196, S.B. No. 344 (amended 2015) (current version at TEX. CODE OF CRIM. PROC. art. 11.073).

[21] 818 S.W.2d 782, 785-86 (Tex. Crim. App. 1991) (citations omitted; emphasis in original).

Although the September 1, 2015 "effective date" provision of the Article 11.073 amendment is not ambiguous, the Legislative history makes it clear that not applying the amended version of Article 11.073 to this pending writ would lead to an "absurd consequence that the Legislature could not *possibly* have intended."[22] Although there is no clause in House Bill 3724 expressly making the 2015 amendments to Article 11.073 applicable to pending writ applications, it was clearly intended by the Legislature that such amendment apply to *this* pending writ application—the proverbial "silver platter." Therefore, this Court should not ignore the clear legislative intent that supports the 2015 amendment's application to Applicant's claim for relief. I am therefore baffled by the decision made by the Court today.

Further support for the amendment's application here is found in the "Criminal Justice Impact" portion of the Bill Analysis, with contains language clearly intending that the amendment not be viewed as an *ex post facto* law:

> It is the committee's opinion that this bill does not expressly create a criminal offense, increase the punishment for an existing criminal offense or category of offenses, or change the eligibility of a person for community supervision, parole, or mandatory supervision.

Article I, Section 16, of the Texas Constitution provides that "[n]o bill of attainder, *ex post facto* law, retroactive law, or any law impairing the obligation of contracts, shall be made." An "*ex post facto* law" is one that (1) punishes as a crime conduct previously

---

[22] *Id.* (emphasis in original) (citing to *Faulk v. State*, 608 S.W.2d 625, 630 (Tex. Crim. App. 1980)).

committed, which was innocent when done; (2) makes more burdensome the punishment of a crime after its commission; (3) deprives one charged with a crime of any defense available at the time when the act was committed; or (4) alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offense, in order to convict the offender.[23]  Early Supreme Court cases reflect that "*ex post facto* law" is a term of art that has an established meaning as a law which "in relation to the offense or its consequences, alters the situation of a party *to his disadvantage*."[24]  Therefore, with regard to determining whether a law is an *ex post facto* law, the determinative issue is whether the retroactive application of the law would be punitive or non-punitive.  If it is non-punitive, (i.e., remedial), then it is not an *ex post facto* law.

The Code Construction Act supports this conclusion.  Although Section 311.022 of the Texas Government Code provides that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective,"[25] and Section 311.031(a)(1) provides that the amendment of a statute does not affect "the prior operation of the statute or any prior action

---

[23] *Carmell v. Texas*, 529 U.S. 513, 522 (2000).

[24] *Kring v. Missouri*, 107 U.S. 221, 228-29 (1883) (emphasis added) *cited with approval in Grimes v. State*, 807 S.W.2d 582, 583-84 (Tex. Crim. App. 1991).  *See also Ex parte Robinson*, 792 S.W.2d 109, 110 (Tex. Crim. App. 1990) ("The amendment affects neither the definition or gravity of the crime itself nor the degree or manner of the punishment therefor.  We perceive no ex post facto violation.")

[25] TEX. GOV'T. CODE § 311.022.

taken under it,"[26] these rules do not apply to remedial or procedural statutes.[27] Texas Government Code Section 311.031(b) specifically provides that "[i]f the penalty, forfeiture, or punishment for any offense *is reduced by* a reenactment, revision, or *amendment* of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute *as amended*."[28]

I believe that the amendment to Article 11.073 is remedial in nature—it was enacted to "expand" the opportunities for relief available under Article 11.073. Its application would result in a favorable outcome for Applicant. Therefore, in this case, because Article 11.073 was amended during the pendency of Applicant's writ application, and addressing his claims for relief under the amended statute would result in a favorable outcome for Applicant, then Article 11.073, as amended, should be applied here.[29]

---

[26] TEX. GOV'T. CODE § 311.031(a)(1) (The Code Construction Act).

[27] *See Ex parte Johnson*, 697 S.W.2d 605, 610 (Tex. Crim. App. 1985) (Onion, J., dissenting) (citing to 53 Tex. Jur. 2d., Statutes, § 29, pp. 49-50).

[28] TEX. GOV'T. CODE § 311.031(d) (emphasis added).

[29] The Rule of Lenity supports our interpretation of the Article 11.073 amendment's effective date provision. Although the Rule of Lenity is triggered only when there is an ambiguity in the statute, and it could be argued that the 2015 amendment's effective date provision is not ambiguous, given the totality of the circumstances involving Applicant's case and the post-conviction proceedings and legislative enactments, we could conceivably find ambiguity in the amendment's effective date provision, particularly in light of its failure to specify whether the amendment is or is not to be applied to pending writ applications. Moreover, the Rule of Lenity has been part of our jurisprudence for over one hundred years, and, under these particular circumstances, it should not be totally discounted. *Murray v. State*, 2 S.W. 757, 761 (1886) ("[I]f there be any fair doubt . . . that doubt is to be resolved in favor of the accused.").

The Court's application of a newly amended statute to a pending writ application is not without precedent. *Ex parte Johnson*,[30] involved a post-conviction writ of habeas corpus brought pursuant to Article 11.07. The applicant complained that his convictions for two aggravated robberies were void and requested a new trial. Specifically, the applicant asserted that the jury's assessment of $15,000 in total fines in addition to terms of years as punishment was unauthorized by law, which made the judgments and sentences void. This Court agreed and addressed the issue of what the proper remedy would be. This Court acknowledged case law holding that a trial court did not have the ability to change a verdict that was void at its inception, noting that they all involved "the lack of a specific vehicle by which the improper verdict could be reformed."[31] The Court addressed the applicability of "a new law" that the Legislature had recently enacted that "enlarges the authority of courts to reform judgments, thus providing a way to cure the infirmity."[32] Senate Bill 1349, effective June 11, 1985, amended Article 37.10[33] by allowing a court to reform a verdict and judgment containing an unauthorized punishment. This Court then addressed whether it could apply the new amendment to the pending writ application:

> Since the amendment does not constitute substantive law defining criminal acts or providing for penalties, it is procedural in nature. *Thus, in the absence*

---

[30] 697 S.W.2d 605 (Tex. Crim. App. 1985).

[31] *Id.* at 607.

[32] *Id.* (citing to Act of June 11, 1985, 69th Leg., R.S., ch. 442, § 1, 1985 Tex. Gen. Laws 1577).

[33] Act of June 11, 1985, 69th Leg., R.S., ch. 442, § 1, 1985 Tex. Gen. Laws 1577. The amendment did not contain a provision that addressed whether the Legislature intended the amendments to apply prospectively only or retroactively.

*of express legislative intent to the contrary, the new law controls litigation
from its effective date and applies to both pending and future actions. . . .* We
must therefore follow the Legislature's mandate and reform that portion of the
verdict unauthorized by law.[34]

Under similar facts, in *Ex parte Youngblood*,[35] the applicant requested in an 11.07 writ

application that his conviction be set aside because it was void due to the imposition of an

improper fine. However, this Court followed *Ex parte Johnson* in holding that the verdict

and judgment could be reformed to delete the improper fine, as opposed to granting the

applicant's request to set aside the conviction and judgment.[36] The applicant then filed a writ

application in Federal District Court, contending that the *Ex Post Facto* Clause of Article I,

Section 10 of the United States Constitution[37] was violated by the retroactive application to

him of the Texas statute[38] that allowed the Court of Criminal Appeals to reform the

unauthorized verdict rather than set it aside. The Federal District Court denied Youngblood

relief, concluding that, since his punishment was not increased (but actually decreased) and

the elements of the offense or the ultimate facts necessary to establish guilt were not

---

[34] 697 S.W.2d at 607-08 (citing to *Wade v. State*, 572 S.W.2d 533 (Tex. Crim. App. 1978)) (emphasis added).

[35] 698 S.W.2d 671 (Tex. Crim. App. 1985).

[36] *Id.* at 672 (holding that the statutory amendment applied to "pending and future actions"). Youngblood filed his writ application on April 22, 1985. The effective date of the amendment to the statute was June 11, 1985.

[37] U.S. CONST. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.").

[38] Act of June 11, 1985, 69th Leg., R.S., ch. 442, § 1, 1985 Tex. Gen. Laws 1577 (codified at TEX. CODE OF CRIM. PROC. art. 37.10) .

changed, there was no *ex post facto* violation.[39]   However, the Fifth Circuit reversed that

decision.[40]   Relying on *Thompson v. Utah*,[41] the Fifth Circuit held that retroactive procedural

statutes violate the *Ex Post Facto* Clause unless they "leave untouched all the substantial

protections with which existing law surrounds the person accused of crime."[42]  The Supreme

Court granted certiorari,[43] and in *Collins v. Youngblood*,[44] the Supreme Court held that the

Texas statute that allowed reformation of improper verdicts was not an *ex post facto* law.

The following excerpts from the Supreme Court opinion are instructive:

> Respondent Carroll Youngblood was convicted in a Texas court of aggravated
> sexual abuse.  The jury imposed punishment of life imprisonment and a fine
> of $10,000.  After his conviction and sentence were affirmed by the Texas
> Court of Criminal Appeals, Youngblood applied for a writ of habeas corpus
> in the State District Court.  He argued that the Texas Code of Criminal
> Procedure did not authorize a fine in addition to a term of imprisonment for his
> offense, and, thus, under the decision of the Court of Criminal Appeals in
> *Bogany v. State*, 661 S.W.2d 957 (1983), the judgment and sentence were
> void, and he was entitled to a new trial.  In April 1985, the District Court,
> feeling bound by *Bogany*, recommended that the writ be granted.
>
> Before the habeas application was considered by the Texas Court of Criminal
> Appeals, which has the exclusive power under Texas law to grant writs of
> habeas corpus, see Tex.Code Crim. Proc. Ann., Art. 11.07 (Vernon 1977 and

---

[39] *See Collins v. Youngblood*, 497 U.S. 37, 40 (1990) (explaining the disposition of the lower federal court in *Youngblood v. Lynaugh*, No. TY-86-211-CA (E.D. Tex. Sept. 13, 1988), which is unavailable electronically).

[40] *Youngblood v. Lynaugh*, 882 F.2d 956 (5th Cir. Sept. 8, 1989).

[41] 170 U.S. 343, 352 (1897).

[42] *Youngblood v. Lynaugh*, 882 F.2d at 959 (quoting *Thompson v. Utah*, 170 U.S. at 352).

[43] 493 U.S. 1001 (1989).

[44] 497 U.S. 37, 40 (Jun. 21,1990).

Supp. 1990), a new Texas statute designed to modify the *Bogany* decision became effective. Article 37.10(b), as of June 11, 1985, allows an appellate court to reform an improper verdict that assesses a punishment not authorized by law. Tex. Code Crim. Proc. Ann., Art. 37.10(b) (Vernon Supp. 1990); see *Ex parte Johnson*, 697 S.W.2d 605 (Tex. Crim. App. 1985). Relying on that statute, the Court of Criminal Appeals reformed the verdict in Youngblood's case by ordering deletion of the $10,000 fine and denied his request for a new trial.[45]

. . . Although the Latin phrase "*ex post facto*" literally encompasses any law passed "after the fact," it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them. . . .[46]

. . . The Texas statute allowing reformation of improper verdicts does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed. Its application to respondent therefore is not prohibited by the *Ex Post Facto* Clause of Art. I, § 10.[47]

The Supreme Court reversed the Fifth Circuit's decision.

In this case, the amended language in Article 11.073, as well as the documents reflecting legislative intent, speak directly to Applicant's claim for relief. The new statute does not punish an act previously committed, nor make more burdensome the punishment for a crime, nor deprive Applicant of any defense previously available.[48] While the

---

[45] *Id.* at 39-40.

[46] *Id.* at 41.

[47] *Id.* at 52.

[48] House Committee on Criminal Jurisprudence, Bill Analysis Report on H.B. 3724, 84th, R.S. (2015) *available at* http://www.legis.state.tx.us/tlodocs/84R/analysis/pdf/HB03724H.pdf#navpanes=0.

amendment may not appear to be procedural, it is clearly remedial and, hence, favorable to Applicant. This Court's application of the 2015 version of Article 11.073 to Applicant's claim for relief brought in his pending 2013 writ application would not constitute the application of an *ex post facto* law. I would hold, therefore, that Applicant's claims for relief raised in his second writ application may be resolved under the 2015 version of Article 11.073.

**B.      Cognizability of This Subsequent Application Under Article 11.07 and Article 11.073—One Hurdle or Two?**

This is Applicant's second Article 11.07 writ application. Applicant's first writ application was also a claim for relief based upon Dr. Moore's change in opinion. However, because Article 11.073 had not yet come into existence, Applicant claimed in his first writ application that he had suffered a due process violation and that he was legally entitled to relief because Dr. Moore had given false and/or misleading testimony.

Article 11.07, Section 4(a) provides that,

[i]f a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.[49]

Article 11.07 defines what makes a legal claim unavailable:

---

[49] TEX. CODE CRIM. PROC. art. 11.07, § 4(a).

For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by and could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.[50]

Article 11.073 was enacted on September 1, 2013, six years after Applicant filed his original application. In *Robbins II*, this Court held that Article 11.073 provided a new legal basis for habeas relief and that the subsequent writ bar did not preclude our review of his claims. I agree with that assessment.

It was suggested in Judge Keasler's *Robbins II* dissenting opinion that, "even if we accept that Dr. Moore's changed individual opinion meets the definition of scientific knowledge or method, it appears that such a change would not satisfy section (d)[51] because it occurred after Robbins's trial and before Robbins's original application, not after."[52] However, such application of section (d)(2) creates a paradox for Applicant, in that it would

---

[50] TEX. CODE CRIM. PROC. art. 11.07, § 4(b).

[51] TEX. CODE CRIM. PROC. art. 11.073(d)(2) (both the 2013 version and the 2015 version) contains its own subsequent writ bar:

> In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether . . . a testifying expert's scientific knowledge. . . has changed since:
>
> (1)    the applicable trial date or dates, for a determination made with respect to an original application; or
>
> (2)    the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

[52] *Robbins II,* 2014 WL 6751684 at *29 (Keasler, J., dissenting).

eliminate his right to relief under Article 11.073 before such right could ever have come into existence. In construing a statute, we give effect to the plain meaning of its language, unless the plain meaning would lead to absurd results that the legislature could not have possibly intended.[53] Judge Keasler's inclination, expressed in his 2014 Dissenting Opinion, to dismiss this writ application pursuant to Article 11.073(d)(2) because it is based on the same factual assertions made in Applicant's original 2007 writ application, (the fact that Dr. Moore's opinion had changed from her trial testimony), would lead to an absurd consequence that was clearly not intended by the Legislature.

**C.     Applicant's Right To Relief Under The Current Version of Article 11.073**

    1.     Article 11.073(a)—The relevant scientific evidence

Article 11.073(a)(2) (both the 2013 version and the 2015 version) affords relief to a writ applicant who can show that there is "relevant scientific evidence" that "contradicts scientific evidence relied on by the state at trial."[54] In *Robbins II*, this Court held that Dr. Moore's revised opinion as to the cause of death being "undetermined," as opposed to her testimony at trial that the death was a "homicide," "is relevant scientific evidence that contradicts scientific evidence relied on by the State at trial: Moore's testimony."[55] I agree.

---

[53] *Yazdchi v. State*, 428 S.W.3d 831, 837-38 (Tex. Crim. App. 2014) (citing to *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)).

[54] Act of June 14, 2013, 83d Leg., R.S., ch. 410, §§ 1-3, sec. 11.073, 2013 Tex. Gen. Laws 1196 (amended 2015) (current version at TEX. CODE OF CRIM. PROC. art. 11.073(d)); Act of June 20, 2015, 84th Leg., R.S., ch. 1263, H.B. 3724 (codified as an amendment to TEX. CRIM. PROC. CODE art. 11.073(d)).

[55] *Ex parte Robbins*, 2014 WL 6751684 at *9.

2.    Article 11.073(d)—Dr. Moore's scientific knowledge has changed

To be entitled to relief under Article 11.073 (both the 2013 version and the 2015 version), Applicant must file an 11.07 writ application containing specific facts indicating that "relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial."[56]  As this Court noted in *Robbins II*, "Article 11.073(d)(1) and (2) provide guidance to the Court in how to make this determination."[57]  Since we now have the benefit of the newly amended version of Article 11.073, I see no reason not to decide this case under that version, which speaks directly to Applicant's right to relief. The amended version of Article 11.073(d)—again, the proverbial "silver platter," provides:

> In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the *field of* scientific knowledge, *a testifying expert's scientific knowledge*, or *a scientific* method on which the relevant scientific evidence is based has changed.[58]

On December 10, 2008, Dr. Moore gave a deposition during the course of the proceedings related to Applicant's first writ application.  Dr. Moore testified as follows:

---

[56] TEX. CODE CRIM. PROC. art. 11.073(b)(1)(A).

[57] *Ex parte Robbins*, 2014 WL 6751684 at *9.

[58] Act of June 20, 2015, 84th Leg., R.S., ch. 1263, H.B. 3724 (codified as an amendment to TEX. CRIM. PROC. CODE art. 11.073(d)) (emphasis added to reflect changes made by the 2015 amendment).

Q.      Okay. Now, I've read your trial testimony. Would you agree that at that time you were very sure that the cause of this child's death was asphyxia due to compression of the chest and abdomen?

A.      At that time, yes, sir.

Q.      And you so testified?

A.      Yes, sir.

Q.      And that the manner of death was homicide?

A.      Yes, sir.

Q.      And you testified that those were your opinions beyond a reasonable doubt?

A.      Yes, sir.

Q.      Is it fair to say that those are no longer your opinions?

A.      Yes, sir.

Q.      Okay. Would it be correct for the Court to conclude that based upon the evidence you have now reviewed, and incorporating what you said here into this question, your additional experience in forensic pathology, that you cannot say within reasonable medical probability more likely than not that the cause of Tristin's death was asphyxia due to compression of chest and abdomen and that the manner of death was homicide?

A.      Yes, sir.

* * *

Q.      Okay. Would it be fair for the Court to conclude from your affidavit and from your testimony here today under oath, that you no longer believe Tristin's death was asphyxia due to compression of her chest and abdomen?

A.      I believe it's undetermined; so, yes.

* * *

Q.   Okay. So nothing about that would tell you that this baby's manner of death was homicide from what you – what you found on autopsy?

A.   Well, back then I did believe that the bruising on the back and the chest compressions was what caused the baby [*sic*]; so, I believed that was caused by another person.  That's what I believed back then, but I don't believe that now.

Q.   What do you believe caused it now?

A.   I'm not sure.

                              * * *

Q.   And now – just so I'm clear on this, Doctor.  And I don't want to belabor it, but I've got to be absolutely clear.  Nine years later, having reviewed everything you've told me that you reviewed in your affidavit –

A.   Yes, sir.

Q.   – having the benefit I guess of having done literally probably thousands more autopsies, right?

A.   Yes, sir.

Q.   Being now board certified in forensic pathology –

A.   Yes, sir.

Q.   – that it is your medical opinion that the cause of death from this child based upon all of the physical evidence and everything that you reviewed is undetermined?

A.   Yes, sir.

Q.   And undeterminable?

A.   Yes, sir.

Q.     Okay.  And that the manner of death for this child, based upon all those same assumptions – what you have now reviewed, your additional training and expertise as a board certified forensic pathologist – is that the manner of death is undetermined?

A.     Yes, sir.

Q.     And undeterminable?

A.     Yes, sir.

In response to additional questioning, Dr. Moore responded as follows:

Q.     And the basis of your reevaluation in this case, not to be trite, isn't a case of buyer's remorse, is it?

A.     No, sir.

Q.     It's not a case of Monday morning quarterbacking where you're second guessing yourself, is it?

A.     No, sir.

Q.     Is your reevaluation in this case the result of any bias, passion, prejudice, or sympathy you have for Neal Robbins or anybody else in this case?

A.     No, sir.

Q.     Is it fair to say that you know more now about forensic pathology than you did when you initially conducted this autopsy?

A.     Yes, sir.

Q.     For instance, you are now board certified as a pediatric pathologist?

A.     Yes, sir.

* * *

Q.    Is it fair to say that the basis for your reevaluation is based on that increase in your knowledge, training, experience, and expertise in pathology?

A.    Yes, sir.

Based on this sworn testimony by Dr. Moore, clearly there has been a change in the "testifying expert's scientific knowledge,"[59] such that the relevant scientific evidence in the form of her newly changed scientific opinion regarding the cause of Tristin's death was not ascertainable through the exercise of reasonable diligence on or before the date of trial.

4.    Article 11.073(b)(2)—Materiality: Applicant would not have been convicted had Dr. Moore's revised scientific opinion been presented at trial

Relief under Article 11.073, section (b)(2), (both the 2013 version and the 2015 version), requires a finding that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.  At trial, Dr. Moore testified unequivocally that the cause of Tristin's death was asphyxiation by compression—a homicide.  Her testimony was critical to the State's case.  The State devoted a large part of its closing argument at trial to discussing why Dr. Moore's testimony was credible.  In urging jurors to convict Applicant, the State repeatedly stressed the importance of Dr. Moore's testimony as to the manner and means of Tristin's death:

•    Now, I submit to you that the testimony of Dr. Patricia Moore is critical on this issue.  She told you that the child died after having her abdomen and her chest compressed with such force that there was no air left in her lungs; and it was done for such a period of time, at least a minute, before she even lost consciousness.  That shows the result was intentional.

_____

[59] TEX. CODE CRIM. PROC. art. 11.073(d) (West 2015).

- We had to prove to you that Tristin's death was caused by asphyxiation. Obviously, this is a major issue in this case. The petechiae that Dr. Moore found indicated that Tristin died by asphyxia, by compression; and that corroborates the bruises that were found on her back and also the hemorrhages between the intercostal muscles of the lower ribs, as well as the hematoma to the kidney.

- Now, let's take a closer look at Dr. Moore's testimony. She told you that there were bruises on Tristin Rivet's body.

- This child, ladies and gentlemen, did not just die. Her life was taken from her. And the evidence that you heard from Dr. Moore specifically and compellingly tells you that.

During the rebuttal portion of its final argument at trial, the State continued to stress the importance of Moore's testimony as to not only the manner and means of Tristin's death, but to denigrate Applicant's defensive theory and Dr. Bux's credibility:

- Defense counsel argued that Dr. Moore is overworked and, therefore, careless. That argument is faulty; and think about the reason why it's faulty. . . . But if she's overworked, then why would she take it upon herself to take a case which had an undetermined cause of death and make it a murder? It doesn't make sense. She had to do more work to bring you this evidence, to bring that report, to investigate the murder.

- Their main witness . . . is Dr. Bux; and Dr. Bux, I submit to you all, is very simply a hired gun for the defendant.

- Dr. Bux told you this wasn't a homicide. He didn't tell you what the child died from, but he told you this wasn't a homicide. Dr. Bux' [*sic*] review of the autopsy report and medical report was sloppy, if not downright dishonest.

- Remember back to when [defense counsel] got up in front of you and talked in voir dire? Will you believe that a doctor could go and testify under oath and lie? Well, that's what Dr. Bux did to you all.

- Ladies and gentlemen, this is a homicide. Make no bones about it. This is a homicide. You had a competent medical examiner get up there and give you reasons as to why she believed this to be a homicide. There is no overcoming that, and it was not overcome by defense counsel's witnesses.

- And Dr. Moore told you something you have to wonder yourselves. Was something done to this child? Dr. Moore then looked at the body of Tristin Skye Rivet, and saw not one, but numerous injuries that acted as markers of trauma. . . . Dr. Moore told you what those injuries and what those red flags were. . . .

- Let's talk about those injuries that Dr. Moore related to the cause of death; that is, the asphyxia by compression. . . . The petechiae. Remember Dr. Moore testified that they are not found in infants of this age. A very important fact. She testified that you don't find petechiae in children of this age.

- Dr. Bux goes and says, well, you find them in areas above the point of compression. . . . Well, Dr. Moore comes back and says, wait a minute; that's not correct.

- . . . Dr. Moore again showed you this injury and photo, State's Exhibit 25, and stated that it was caused by compression to the lower chest area from the back, not the front. That's consistent with what she believed to be the cause of death. You put all of these facts together with the facts–with other facts, and what do you have? It's a homicide.

Dr. Moore's testimony was the only evidence supporting the State's assertion that Tristin's death was a homicide. Dr. Moore was not simply an expert presented by the State to weigh in on the cause of death. Dr. Moore was the medical examiner who performed the autopsy. The State relied heavily on Dr. Moore's expert testimony to meet its burden of proving Applicant guilty of capital murder. By finding Applicant guilty of capital murder,

the jury obviously believed Dr. Moore's testimony and rejected the contrary testimony of Dr. Bux, who stated that the cause of Tristin's death was "undetermined."

The original opinion contains a very cursory analysis of the materiality issue. I would delve deeper in addressing the State's argument—that Applicant is not entitled to relief since the prosecution could have presented the testimony of a different pathologist, Dr. Linda Norton, to support its theory that the death was a homicide. The test for materiality under Article 11.073(b)(2) does not factor in what the State could have presented. The test under the statute is whether, had the scientific evidence (Dr. Moore's revised opinion) been presented *at trial*, on the preponderance of the evidence Applicant would not have been convicted. We look at what evidence was before the jury at that time, not what other evidence might have or could have been presented to the jury.[60] The Autopsy Report reflecting Dr. Moore's opinion that the death was a homicide was admitted into evidence as Defendant's Exhibit 2. Dr. Joye Carter, the Harris County Chief Medical Examiner, was Dr. Moore's supervisor at that time and had co-signed the Autopsy Report. Significantly, Dr. Carter has also reconsidered her opinion, and she now agrees that the cause of death is "undetermined," as do Dr. Wolf and Dr. Wheeler.

---

[60] *See, e.g., Ex parte De La Cruz*, 466 S.W.3d 855, 871 (Tex. Crim. App. 2015) (holding that "the new habeas evidence, viewed in light of the totality of *the record*, fails to demonstrate by a preponderance of the evidence that Torres's testimony *gave the jury* a false impression.") (emphasis added); *Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014) (holding that "false testimony is *material* only if there is a "reasonable likelihood" that it affected the judgment of the jury.") (emphasis in original).

The State has also argued that the evidence of previous injuries inflicted upon Tristin by Applicant makes it likely that a jury would still have found Applicant guilty of causing Tristin's death, even if Dr. Moore's revised opinion had been presented at trial. There are flaws in that argument. The evidence of previous injuries Tristin suffered while she was in Applicant's care cannot be considered as evidence that Applicant acted in conformity with such conduct and therefore committed *this* offense. As this Court noted in *Robbins v. State*, "[r]elevant evidence of a person's bad character is generally not admissible for the purpose of showing that he acted in conformity therewith."[61] This evidence was, however, properly admitted by the trial court as extraneous offense evidence.[62] The trial court gave the following limiting instruction to the jury.

> In reference to evidence, if any, that the defendant has previously participated in recent transactions or acts, other than but similar to that which is charged in the indictment in this case, you are instructed that you cannot consider such other transactions or acts, if any, for any purpose unless you find and believe beyond a reasonable doubt that the defendant participated in such transactions or committed such acts, if any; and even then you may only consider the same for the purpose of determining intent or absence of accident or as relevant facts and circumstances surrounding the previous relationship existing between the defendant and the deceased.

---

[61] *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002) (citing *Montgomery v. State*, 810 S.W.2d 372, 386-88 (Tex. Crim. App. 1990) (op. on reh'g)).

[62] *Id.* at 258. The trial court admitted the relationship evidence under TEX. CODE CRIM. PROC. art. 38.36(a), and also overruled Robbins' objections that this evidence was inadmissible under TEX. R. EVID. 404(b) and 403. The Court of Appeals held that this evidence was probative of intent and lack of accident under Rule 404(b) and that it was not unfairly prejudicial under Rule 403. This Court affirmed the Court of Appeals' holding.

The jury could not consider Tristin's previous injuries as direct evidence that Applicant acted in conformity therewith in committing this offense. Thus, such evidence should not be given more weight than it could be given at trial when this Court assesses whether Applicant has met the materiality requirement of Article 11.073(b)(2).

After Applicant filed his first writ application, the trial judge made findings that are relevant and pertinent to the determination of materiality. Rather than fall back on the original opinion's brief conclusion regarding that issue, I would highlight the following trial court findings:

(1)    Dr. Moore's testimony at trial was "critical" to the State's case and "her opinions were the sole bases of the State's case as to the cause and manner of death, without which the State would not have obtained a conviction;

(2)    Dr. Moore was an agent of the State, and when she testified, she "acted in the name and for the State, was clothed with the State's power, and her acts were those of the State;

(3)    Dr. Moore "was not competent at the time of trial to offer objective and pathologically sound opinions as to cause and manner of death in this case.

Because Dr. Moore's testimony was the only evidence supporting the State's assertion that Tristin's death was a homicide,[63] I agree that Applicant has satisfied the materiality requirement in Article 11.073(b)(2).

---

[63] *See, e.g., Ex parte Chabot*, 300 S.W.3d 768, 772 (Tex. Crim. App. 2009) ("Pabst's testimony provided the only direct evidence that the applicant sexually assaulted and killed Crosby. . . . [W]e agree that it is more likely than not that Pabst's perjured testimony contributed to the applicant's conviction and punishment.")

## CONCLUSION

This case presents a very unique set of facts and circumstances. Granting relief under the language of the newly amended Article 11.073 would have been a very limited holding, and I do not believe it would have opened any floodgates. During the pendency of this writ, the Legislature amended the very portion of the statute at issue here, and the amended language clearly allows Applicant relief. Rather than revert back to the original opinion that was decided under the 2013 version of Article 11.073, I think this Court should have given deference to the intent of the Legislature, which intent was clearly and unambiguously expressed when the language of Article 11.073 was amended to encompass what transpired in this case. Therefore, I do not join the majority. I concur in the result only.

FILED: January 27, 2016
PUBLISH